**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

TOWN OF EAST HAMPTON,

                    Plaintiff,

      -against-

INCORPORATED VILLAGE OF EAST HAMPTON
d/b/a EAST HAMPTON FIRE DEPARTMENT,
EAST HAMPTON FIRE DISTRICTS TRAINING
FACILITY, INC.,

                    Defendants,

AMERICAN ALTERNATIVE INSURANCE
CORPORATION,

                As Interested Party.

MDL Case No. 20-cv-01665 (RMG)

EDNY Case No. 20-cv-1787

**AMENDED COMPLAINT**

      Plaintiff Town of East Hampton ("Plaintiff" or "Town") by and through its attorneys, Rigano LLC, as and for its amended complaint against Defendant Incorporated Village of East Hampton d/b/a East Hampton Fire Department ("Village") and Defendant East Hampton Fire Districts Training Facility, Inc.  ("Training Corporation" and with Village, "Defendants"), and naming American Alternative Insurance Corporation ("AAIC") as Interested Party in its capacity as insurer to Village, respectively, alleges as follows:

**Nature of the Action**

      1.    Plaintiff brings this action pursuant to 42 U.S.C. §§ 6972(a)(1)(B) (RCRA), 9607(a), 9613(f)(1), 9613(f)(3)(B) and 9613(g)(2) (CERCLA) against Defendants,[1] for, among

---

[1]    Village is insured by AAIC.  The liability policies issued by AAIC grant coverage to Village and the East Hampton Fire Department as insureds.  The coverage limits for the period of 1998 to 2018, inclusive of the excess policy limits range from $13 million to $23 million per year.  The policies contain an applicable exception to the pollution exclusion whereby the policies cover all losses related to pollution caused by "Emergency operations",

other things: (I) injunctive relief requiring Defendants to: (i) properly dispose of all aqueous film-forming foam ("AFFF") in their possession, custody or control that contains latent toxic chemicals called perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonate ("PFOS") and/or PFOA/PFOS precursors, (ii) immediately disclose by fact discovery document production and testimony all locations where East Hampton Fire Department ("EHFD") and Training Corporation used AFFF, stored AFFF and washed AFFF equipment at the Airport (defined below) and/or within the boundaries of the Superfund Site (defined below), and (iii) investigate and remediate all PFOA/PFOS contamination at and emanating from the Airport and/or Superfund Site; (II) recovery of Town's past and future costs and damages associated with investigating and remediating the human health and environmental issues caused by the PFOA/PFOS contamination at and emanating from the Superfund Site, including, but not limited to, Plaintiff's costs in connection with: (i) supplying bottled water to the Town's residents who have detected perfluorinated compounds in their drinking water wells, (ii) extending the public drinking water supply line and connecting the homes of Wainscott residents thereto to enable the supply of clean and safe drinking water, (iii) investigating, treating, and remediating contamination at and emanating from the Superfund Site (defined below) located in Wainscott (defined below) to eliminate PFOA/PFOS contamination caused, in whole or in part, by EHFD, (iv) protecting the public health, safety, welfare, and the environment; and (III) declaratory judgment against Defendants for allocation of future related costs to the investigation and remediation of

---

"Training operations", "Water runoff from the cleaning of equipment used in 'emergency operations'", and "property damage" caused by a "hostile fire". The marketing materials for the policies provide examples of coverage that are substantially similar to the losses set forth in this complaint. More information regarding the policies and marketing materials are discussed *infra*.

contamination at and emanating from the Superfund Site.[2]

## Jurisdiction and Venue

2.      Plaintiff brings this civil suit pursuant to: (i) the citizen suit enforcement provisions of Section 7002 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), and (ii) sections 42 U.S.C. 9607(a), 9613(f)(1), 9613(f)(3)(B), and 9613(g) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

3.      Subject matter jurisdiction over the parties and this action exists pursuant to 42 U.S.C. §§ 6972(a), 9613(b) and 28 U.S.C. §§ 1331, 1367.

4.      Venue properly lies in the Eastern District of New York pursuant to 42 U.S.C. §§ 6972(a) and 9613(b) as well as 28 U.S.C. § 1391(b) because the endangerment may occur, the release(s) of contamination did occur and damages did occur in this district, among other reasons.

5.      On June 5, 2019, the United States Judicial Panel on Multidistrict Litigation transferred this case to the District of South Carolina as a "tag along" case with respect to the Multi-District Litigation styled *In re Aqueous Film-Forming Foams Products Liability Litigation*, Case No. 18-mn-2873-RMG.

6.      On November 12, 2019, Plaintiff notified Village and third parties as required of Plaintiff's intention to file suit against Village to remedy the imminent and substantial endangerment referenced as the First Cause of Action in compliance with the statutory notice requirements set forth in 42 U.S.C. § 6972(b)(2)(A), and the corresponding regulations set forth in 40 C.F.R. Part 254.

7.      Plaintiff commenced this action more than ninety (90) days after Plaintiff served

---

[2]      As New York State and the United Stated Environmental Protection Agency are in the process of studying and regulating PFOA/PFOS and other PFAS in various capacities, the allegations set forth herein should be construed broadly to apply to all regulated PFAS (not only PFOA/PFOS) and all pertinent regulations in effect as this case proceeds to allow the Town to recover all costs incurred to investigation and remediate the contamination at issue.

the November 12, 2019 notice letter on Village, during which time (and since the commencement of this action) Village has failed to commence any action to redress the endangerment referenced in the letter and continues to withhold material information from the Town regarding locations where EHFD used and stored AFFF.

8.    At the time of this litigation was filed, Plaintiff provided and served copies of the Complaint to the Attorney General of the United States and the Administrator of the United States Environmental Protection Agency pursuant to 42 U.S.C. §§ 6972(b)(2)(F), 9613(l).

9.    At the time of this Amended Complaint was filed, Plaintiff provided and served copies of the Amended Complaint to the Attorney General of the United States and the Administrator of the United States Environmental Protection Agency pursuant to 42 U.S.C. §§ 6972(b)(2)(F), 9613(l).

10.    The Court has authority to issue a declaratory judgment concerning the rights and liabilities of the parties pursuant to 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. §§ 6972(a), 9613(g)(2).

<u>**Parties**</u>

11.    Plaintiff Town of East Hampton is a municipality located in southeastern Suffolk County, New York.

12.    The Town's population consists of approximately 21,000 people.

13.    The Hamlet of Wainscott ("<u>Wainscott</u>") is a neighborhood within the Town and subject to the Town's jurisdiction.

14.    Plaintiff owns the land located at the East Hampton Airport (the "<u>Airport</u>") located at 200 Daniels Hole Road Wainscott, NY and East Hampton Fire Districts Training Facility k/n/a Lawrence Franzone Fire Training Facility located at 65 Industrial Road, East Hampton, New York

(the "<u>Fire Training Facility</u>") located in Wainscott.

15.     Defendant Incorporated Village of East Hampton is a municipality in Suffolk County, New York located in the Town of East Hampton and is a separate, smaller jurisdiction than the Town.

16.     Defendant Village (and not the Town) owns, operates and directs EHFD which stored and used AFFF in Wainscott and caused the contamination at issue.

17.     EHFD maintains a substation at 72 Industrial Road Wainscott, NY, near the Airport, but off of the Airport property (the "<u>EHFD Substation</u>").

18.     The Town owns the land where the EHFD Substation is located.

19.     In or around 2001, the Town constructed the EHFD Substation.

20.     Prior to the construction of the EHFD Substation, the property was vacant and wooded.

21.     Since that time, EHFD has been the sole tenant and operator of the property. The Town has charged the Village nominal rent for EHFD's occupancy of the EHFD Substation.

22.     The Town has paid the Village approximately $1 million per year for EHFD's services provided at and around the Airport for approximately two decades, if not longer (approximately $20 million total plus).

23.     EHFD has stored AFFF and parked AFFF trucks at the EHFD Substation during all relevant times.

24.     EHFD stored AFFF at the EHFD Substation located at the Airport in fifty-five (55) gallon drums without a secondary containment system meaning if AFFF from the drums leaked or a drum cracks, AFFF would impact the immediately neighboring soil.

25.     EHFD has extinguished actual fire in Wainscott by use of AFFF, including at the Airport and surrounding properties.

26.    EHFD has used AFFF during training exercises at the Airport and upon information and belief, at the Fire Training Facility or caused contamination at those properties by other means.

27.    After use of AFFF, EHFD would wash its trucks and equipment in a separate and distinct location from where it used AFFF.

28.    By such washing, the AFFF residue was released to the ground causing PFOS and/or PFOA contamination.

29.    Despite demand made by the Town in writing, Village has not disclosed all locations where EHFD used AFFF, stored AFFF, and/or washed AFFF equipment within the boundary of the Airport and/or Superfund Site.

30.    Defendant Village is a member of the Fire Training Facility.

31.    Defendant East Hampton Fire Districts Training Facility, Inc. is a New York corporation with a principal place of business in Wainscott, New York.

32.    Defendant Village is a member of Defendant Training Corporation.

33.    Defendant Training Corporation operates the Fire Training Facility.

34.    Defendant Training Corporation stored and used, or authorized the storage or use of, AFFF and/or other substances that contained PFAS at the Fire Training Facility, which caused the contamination at issue.

35.    Defendant Training Corporation washed, or allowed the washing of, AFFF equipment at the Fire Training Facility, which caused the contamination at issue.

36.    AAIC is a Delaware Corporation with a headquarters at 555 College Road East, Princeton, NJ 08540 and is as interested party to this litigation as insurer to Defendant Village.

## Factual Background

### I.    PFAS Substances

37.    Per- and polyfluoroalkyl substances ("PFAS") are a family of hundreds of man-made chemicals comprised of primarily carbon and fluorine.

38.    PFAS chemicals were invented in the 1930's.

39.    PFAS chemicals are effective in products requiring fire extinguishment and repellency of water, oil, and stains.

40.    PFOA and PFOS are the two most widely studied PFAS chemicals.

### II.    Biopersistent, Bioaccumulative and Toxic Effects of PFOA and PFOS

41.    PFOA and PFOS are man-made chemicals that do not exist naturally.

42.    PFOA and PFOS are biopersistent.

43.    PFOA and PFOS can persist in the environment for decades.

44.    PFOA and PFOS do not easily degrade.

45.    PFOA and PFOS readily move through soil, sand and water.

46.    PFOA and PFOS are highly soluble in water.

47.    PFOA and PFOS bioaccumulate in humans, animals, and fish.

48.    PFOA and PFOS biomagnify in humans, animals, and fish.

49.    PFOA and PFOS can accumulate through the food chain.

50.    PFOA and PFOS may accumulate in humans in the serum, kidney and liver.

51.    PFOA and PFOS have a lengthy half-life within the human body.

52.    PFOA and PFOS have been found to cross the placenta wall from pregnant mother to fetus.

53.    PFOA and PFOS can be transferred from mother to infant via breastmilk.

54.    The United States Environmental Protection Agency ("EPA") has found that PFOA and PFOS may cause harm to developing fetuses and breastfed infants via transmission from the mother.

55.    PFOA and PFOS are toxic at very low levels.

56.    Human exposure to PFOA and PFOS has been linked to several diseases including testicular cancer, kidney cancer, thyroid disease, ulcerative colitis, hypertension and other conditions.

57.    The full health risk and impacts of exposure to PFOA and PFOS are still being studied.

58.    Injuries associated with PFOA and PFOS are typically latent and may manifest years or decades after exposure.

59.    Studies have shown that approximately 99% of Americans have detectable levels of PFOA and/or PFOS in their blood.

60.    Studies have shown that virtually every baby born in America is born with a detectible level of PFOA and/or PFOS in his/her blood.

61.    There is no background or naturally occurring level of PFOA and/or PFOS as the chemicals are not natural and are man-made.

62.    No human had PFAS in their blood prior to the chemicals being invented.

63.    PFAS substances, and particularly PFOA and PFOS, have been detected ubiquitously throughout the world including as far as the Arctic.

64.    Due to the foregoing, the manufacture, import and use of PFOA and PFOS is restricted in the United States.

65.    On May 16, 2000, the EPA publicly announced the phaseout of PFOS from production because "these chemicals are very persistent in the environment, have a strong

tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."  The press release went on to state "PFOS chemicals are used to produce a range of products from fire-fighting foams coatings for fabrics, leather, and some paper products, to industrial uses such as mist suppressants in acid baths."

66.    The press release received national news attention in the New York Times, among other media outlets.

67.    In 2009, the Stockholm Convention on Persistent Organic Pollutants restricted production and use of PFOS.  In 2019, the Stockholm Convention on Persistent Organic Pollutants added PFOA to the list of substances to be eliminated from production and use.

68.    EPA authorized New York State to implement its own hazardous waste program pursuant to 42 U.S.C. 6926(b).

69.    New York accepted that authority pursuant to New York Environmental Conservation Law sections 27-0900, *et seq.*

70.    Thus, pursuant to 51 Fed. Reg. 1779 [1986], New York State is authorized to "operate in lieu of the Federal [hazardous waste] program."

71.    In 2016, PFOA and PFOS were added to New York State's list of hazardous substances.

72.    In 2016, EPA established a drinking water health advisory of seventy (70) parts per trillion of combined PFOA/PFOS.

73.    Certain states have promulgated advisory exposure levels lower than seventy (70) parts per trillion.

74.    On August 26, 2020, New York State promulgated Maximum Contaminant Levels in drinking water for PFOA and PFOS for 10 parts per trillion (ppt) each (the "MCLs").

75.    A MCL is the maximum level of a contaminant allowed in public drinking water,

9

which, once established, creates a legally enforceable standard that requires applicable water systems to monitor, report findings and keep the contaminant below the level set.

76.    Exceedances of MCLs must be reported to the public and require mitigation once promulgated and effective.

77.    MCLs serve as a safety guideline for private drinking water wells.

78.    In New York State, groundwater cleanup standards for a particular contaminant are set at the same level as an applicable MCL.

79.    New York State is considering promulgating MCLs for other PFAS.

80.    New York State has published soil cleanup guidelines for PFOA of 0.66 ppb for unrestricted use and 1.1 ppb for protection of groundwater.

81.    New York State has published soil cleanup guidelines for PFOS of 0.88 ppb for unrestricted use and 3.7 ppb for protection of groundwater.

82.    New York State has proposed soil cleanup objectives for PFOA of 0.66 ppb for unrestricted use and 0.8 ppb for protection of groundwater.

83.    New York State has proposed soil cleanup objectives for PFOS of 0.88 ppb for unrestricted use and 1.0 ppb for protection of groundwater.

84.    Further, NYSDEC has proposed guidance values to protect human health in raw drinking water sources (such as Long Island groundwater) of 6.7 ppt for PFOA and 2.7 ppt for PFOS.

### III.    Environmental Impacts of PFOA/PFOS

85.    PFOA and PFOS contamination of environmental media (i.e. soil and groundwater) is prevalent throughout the country.

86.    Airports, fire stations, and firefighting training facilities are of particular concern for PFOA/PFOS contamination due to use of AFFF at those facilities.

87. Upon PFOA, PFOS (or their precursors) coming into contact with soil, PFOA and PFOS migrate downward through the soil until they reach the groundwater.

88. PFOA and PFOS readily dissolve into groundwater.

89. With its natural movement, the groundwater flows and, if contaminated with PFOA and PFOS, the groundwater carries PFOA and PFOS spreading the contamination over a wide area.

90. Groundwater contaminated with PFOA and PFOS is of particular concern where groundwater is used as drinking water.

91. In 1978, EPA declared Suffolk County as a sole source aquifer meaning: (i) "[t]here are no reasonably available alternative drinking water sources should the aquifer become contaminated", and (ii) "if contaminated, [the aquifer] would create a significant hazard to public health."

92. The residents of the Town, including residents of Wainscott, rely on the sole source aquifer (i.e. the groundwater) for their drinking water.

93. On Long Island, drinking water supply wells supply drinking water by pumping groundwater from the aquifer.

94. Where groundwater is contaminated, drinking water supply wells pump and supply the contaminated groundwater as drinking water if such water is not treated.

95. A majority of residents in the Town obtain water from private drinking water wells.

96. These wells pump groundwater from beneath residents' individual properties.

97. Private wells are generally shallow wells and are more susceptible to contamination than public drinking water supply wells, which generally pump deeper groundwater that is less susceptible to contamination.

**IV.    PFOA/PFOS Contamination Discovered in the Hamlet of Wainscott**

98.     In Wainscott, groundwater generally flows in a south/southeasterly direction from the Airport, EHFD Substation, and Fire Training Facility and towards approximately 520 residences and businesses.

99.     Residents in Wainscott obtain their drinking water from the groundwater.

100.     Prior to Town's actions discussed herein, residents in Wainscott obtained their drinking water from groundwater supplied by private wells on each separate property.

101.     Because residents of Wainscott live downgradient from the Airport, EHFD Substation and Fire Training Facility where AFFF was used and stored and those residents rely on private drinking water wells, Suffolk County Department of Health Services sampled Wainscott residents' private wells in 2017.

102.     As a result of that sampling, it was first discovered in October 2017 that the private wells of several Wainscott residents were contaminated with PFOA and PFOS in excess of the EPA health advisory level of seventy (70) ppt and many more above the MCLs of ten (10) ppt.

103.     For a period after October 2017, Suffolk County Department of Health Services has offered free testing of private wells to residents and property owners within Wainscott.

104.     The geographic bounds of the area of concern was defined by Suffolk County Department of Health Services as follows: a northern boundary of the Airport, an eastern boundary of Daniels Hole Road and Georgica Pond, a southern boundary of the Atlantic Ocean and the western boundary by the area immediately west of Wainscott Harbor Road, Town Line Road and Wainscott Hollow Road.

105.     Over 230 private wells within the area of concern were found to contain PFOA and/or PFOS.

106.     Over seventy-five (75) private wells within the area of concern were found to contain PFOA and/or PFOS at levels in excess of the MCLs.

107.    Over ten (10) wells within the area of concern were found to contain PFOA and/or PFOS at levels in excess of the EPA's seventy (70) parts per trillion health advisory level.

108.    As the impacted private wells did not have treatment for PFOA or PFOS, Wainscott residents were drinking contaminated water potentially for decades.

109.    All private wells within the area of concern required remediation because PFOA or PFOS may latently enter private wells at unacceptable levels at any time as other contaminated wells in the area reveal that the groundwater contamination is area-wide and flowing.

110.    It is not feasible for homeowners to consistently and reliably test their private wells for PFOA and PFOS due to the exorbitant sampling cost, among other reasons.

**V.**    **Actions of Plaintiff to Mitigate the Harm to Human Health and the Environment**

111.    Immediately upon learning of the contamination in Wainscott residents' private drinking water wells in October 2017, Plaintiff engaged in numerous efforts to protect the health, safety and welfare of its residents as well as the environment.

112.    In October 2017, Plaintiff advised residents located within the area of concern not to drink, cook or shower with their private well water.

113.    Beginning in October 2017, Plaintiff supplied bottled water for drinking, cooking and bathing to certain Wainscott residents as a result of PFOA/PFOS detection in residents' private wells.

114.    Plaintiff has incurred significant costs associated with providing bottled water to impacted residents.

115.    On November 10, 2017, NYSDEC, through its Division of Environmental Remediation, sent a letter to the Town stating, in pertinent part as follows:

> We have received information that certain perfluorinated compounds (PFCs) have been detected in nearby water supply wells, which may be attributable to current or past operations on your

property. These compounds are known components of firefighting foams, and are listed as hazardous substances in New York State (6 NYCRR Part 597). This information leads us to suspect that hazardous waste may have been disposed of at [the Airport].

Therefore, this letter constitutes DEC's notification to you as the identified property owner that this property is considered a potential inactive hazardous waste disposal site. If DEC determines that hazardous waste has been disposed of on the property and that the hazardous waste poses a significant threat to public health or the environment, the property will be listed on the Registry of Inactive Hazardous Waste Disposal Sites (Registry). . .

This letter also serves as DEC's notification to you of the need to carry out an investigation in accordance with DEC's technical requirements for a site characterization. In addition to carrying out the investigation (which will include installing and sampling on-site wells), there is a need to install point of entry treatment systems (POETS) or other alternate water supply (i.e., waterline extension) to address the contaminated water supply wells mentioned above. Also bottled water must be provided until such time as that system or alternate supply is in place. We understand that, presently, the Town of East Hampton is providing bottled water to the affected residences.

Please contact me within 10 business days to discuss the necessary scope of the investigation and the installation of the POET systems or alternate water supply. . . if the site is determined to be an inactive hazardous waste disposal site and DEC incurs costs to investigate or remediate the site, DEC will seek to recover all such costs from any responsible person.

116.    The Suffolk County Water Authority's local public drinking water distribution system is not contaminated with PFOA, PFOS or any other contaminants in excess of binding standards, health advisories or the MCLs.

117.    In accordance with NYSDEC direction, Plaintiff extended the public drinking waterline operated by the Suffolk County Water Authority to Wainscott.

118.    The connection of Wainscott properties to Suffolk County Water Authority's public water supply has enabled private residents to no longer rely on their private wells for

drinking water.

119.    Hundreds of residences have already connected to the public drinking water supply.

120.    The cost to Plaintiff of the water main extension is no less than $7,591,425.93 to extend the water main.  This cost assumes state grants of $5,044,423.00 are received.  To the extent such grants are not received, Plaintiff will be obligated to pay that additional amount ($5,044,423).

121.    This cost only is for the extension of the water main, not for connection costs from properties' to connect to the main.  As set forth *infra* Town is in the process of connecting certain properties to the water main at substantial cost pursuant to the direction of NYSDEC.

122.    Plaintiff has hired numerous environmental professionals to investigate and monitor the PFOA/PFOS in environmental media.  Those costs are ongoing and continue to mount.

**VI.    Defendants' Use and Storage of AFFF Caused PFOA and PFOS Contamination**

123.    PFOA/PFOS or their precursors are, or have been, contained in AFFF.

124.    AFFF has been used for decades to extinguish flammable liquid fires.

125.    AFFF concentrate is mixed with water to make a liquid foam which is aerated and applied to fire suffocating the fire of oxygen and thereby extinguishing it.

126.    Upon AFFF being sprayed, the AFFF material contacts the ground and PFOA and PFOS or their precursors enter the soil.

127.    The PFOA/PFOS or their precursors then migrate through the soil to the groundwater below causing PFOA/PFOS contamination.

128.    AFFF has been stored and used throughout the country at, among other places, airports, fire stations, and firefighting training facilities.

129.    As a result, PFOA/PFOS contamination is prevalent at and emanating from airports and firefighting training facilities throughout the country.

130.    On January 24, 2017, Chief Gerard Turza, the Chief of the East Hampton Fire Department completed the Class B Fire Suppression Foam Usage Survey and submitted the same to NYSDEC.  By the Survey, Mr. Turza represented, *inter alia*, as follows: (i) approximately 200 gallons of AFFF was and, at the time, continued to be stored at the EHFD Substation, (ii) training with AFFF occurred between 1 and 10 times between 2007 and 2017 for "various training evolutions", (iii) AFFF was used for emergency response "several times unknown exact dates" between 2007 and 2017

131.    Mr. Turza's statements set forth in this survey are corroborated by pictures in the Town's possession, information in the Town's possession, as well as locations of soil and groundwater contamination found in areas where EHFD used and stored AFFF.

132.    Some of the instances in which the Village, through EHFD used AFFF at and around the Airport include:  (i) on or around August 28, 2012, use of AFFF to extinguish fire caused by a plane crash at the eastern part of the Airport, (ii) on or around June 6, 2008 training exercise where AFFF was used by the fire departments at the northern part of the Airport, (iii) in 1997, a training exercise where AFFF was used by the fire departments at the eastern part of the Airport, (iv) in 1995, use of AFFF to extinguish fire caused by a plane crash at the northern part of the Airport, and (v) continuous AFFF use by the fire departments at the Fire Training Facility.

133.    Further, certain police reports maintained by the Town reveal that EHFD responded to various plane crashes at or around the superfund site.  Police reports dated October 11, 1997 and November 29, 1998 expressly state that EHFD arrived at the scene and used foam. Others dated December 23, 1995, August 30, 1998 and November 26, 1998 state that planes flipped over, there was a gas leak and possible fire or that EHFD responded for washdown.

134.    Defendants' use of AFFF, storage of AFFF and washing of AFFF equipment has caused contamination at and emanating from the Airport, Fire Training Facility, EHFD Substation and Wainscott residents' drinking water wells.

135.    After each AFFF use, AFFF leak or AFFF equipment washing event, Defendants did not to contain the release or otherwise mitigate environmental harm by failing to, among other things: (i) excavate impacted soil, or (ii) place a liner on the ground to prevent migration of PFOA/PFOS before AFFF training use or to contain leakage from storage/washing.

**VII.    NYSDEC Designates Town's Properties as a Superfund Site**

136.    In 2018, NYSDEC conducted a site characterization of the Airport, EHFD Substation, and Fire Training Facility to determine if the PFOA/PFOS contamination is present at those properties.

137.    Before conducting the site characterization, NYSDEC, through its contractor conducted a site review.  NYSDEC's site characterization report states the site review involved:

>    Site Review: Identify potential historical events with AFFF use, such as training events, plane/car crashes on airport property where AFFF was applied, as well as current/former AFFF storage areas. Select proposed sample locations with final placement to be established during site visits.
>
>    Preliminary Activities: Attend on-site meeting with NYSDEC personnel to discuss proposed sampling locations based on research findings. Solicit subcontractor bids, formalize budget, and prepare health and safety plan.

138.    NYSDEC's report goes on to state:

>    Using information provided by local, county, and state contacts along with available topographic and geologic mapping, AECOM staff identified several target areas that warranted subsurface investigation, including known areas of AFFF discharge. Additional locations were selected for a second phase of investigation after initial results were reviewed.

139.    The site review resulted in fourteen (14) target sampling areas after NYSDEC and its contractor conducted their robust independent research to determine the target areas of concern.

140.    This site characterization resulted in NYSDEC detecting significant PFOA/PFOS contamination in both soil and groundwater at the Airport, EHFD Substation and Fire Training Facility.

141.    NYSDEC has concluded that there are distinct "areas of concern" at the Airport, EHFD Substation and Fire Training Facility comprising approximately forty-seven (47) acres.

142.    NYSDEC has concluded that all detected PFOA/PFOS contamination at the Airport, EHFD Substation and Fire Training Facility is located in areas where EHFD used AFFF and where EHFD stored AFFF and AFFF equipment.

143.    Specifically, contamination was detected as follows:[3]

   a.   At the location of a 1995 plane crash at the northern part of the Airport, NYSDEC detected PFOA/PFOS contamination at 3600 ppt in soil and 17.7 ppt in groundwater (more than the MCL).  The following are pictures of this event:



---

[3]        The AFFF events listed in this section are examples of EHFD AFFF use/storage which have caused contamination and should not be deemed an exhaustive list.  Town expects discovery to reveal additional uses/locations of EHFD AFFF use, storage and washing of equipment as well as PFOA/PFOS contamination in those areas.



b. The location of a 1997 EHFD training exercise at the eastern part of the Airport, NYSDEC detected PFOA/PFOS contamination at 720 ppt in soil and 299.3 ppt in groundwater (approximately thirty (30) times the MCL). The following is a picture of this event:



c. The location of the 2008 EHFD training exercise at the northern part of the Airport, NYSDEC detected PFOA/PFOS contamination at 4000 ppt in soil and 287 ppt in groundwater (approximately thirty (30) times the MCL). The following is a picture of this event:



d. The location of the EHFD Substation which is south of the Airport. This location is where EHFD stored AFFF and AFFF equipment and presumably washed such equipment. NYSDEC detected PFOA/PFOS contamination at 3900 ppt in soil and 174 ppt in groundwater in this location (approximately seventeen (17) times the MCL).

e. At the Fire Training Facility on Industrial Road which is just south of the Airport where Training Corporation authorized training to occur, NYSDEC detected PFOA/PFOS contamination at 15.8 ppb in soil and 160 ppt in groundwater (approximately sixteen (16) times the MCL).

144.    NYSDEC's report concludes "[t]he presence of PFAS compounds in soil above laboratory reporting limits indicate that release(s) have occurred on-site . . . Investigation findings show that the historic use and/or storage of AFFF have impacted Site groundwater quality."

145.    On May 24, 2019, NYSDEC designated the areas of concern comprising forty-seven (47) acres of the Airport, EHFD Substation and Fire Training Facility as a Class 2 Inactive Hazardous Waste Disposal Site (and if and when subsequently expanded or contracted by NYSDEC, the "Superfund Site") as a result of the detected PFOA/PFOS contamination and AFFF use, AFFF storage and washing of AFFF equipment by Defendants.

146.    The Class 2 designation means that "the disposal of hazardous waste has been confirmed and the presence of such hazardous waste or its components or breakdown products represents a significant threat to public health or the environment."

147.    On April 9, 2019, after reviewing NYSDEC's site characterization report, the New York State Department of Health sent a letter to NYSDEC stating, in pertinent part, that the Superfund Site "represents a significant threat to human health."

148.    The areas of concern "consist of the area in and around the terminal, the fuel depot, the north end of the runway 34 and west of Daniels Hole Road as one area, the area around the fire training facility and along Industrial Road as the second area, and the area around the separate structure housing the fire-fighting equipment off Industrial Road on the southeast portion of the airport as the third area."

149.    NYSDEC issued the following picture outlining in red the areas that comprise the Superfund Site:



150.     Each of these areas are areas where the Village, through EHFD used or stored AFFF and where Fire Training Facility is located.

151.     The superfund site designation requires the Town as property owner of the Airport, EHFD Substation, and Fire Training Facility to investigate and remediate all contamination at and emanating from the Superfund Site at a significant cost.

152.     As a result of the superfund site designation, on May 7, 2020, NYSDEC formally demanded, pursuant to the New York Environmental Conservation Law ("ECL") and applicable NYSDEC regulations, that the Town enter into a binding consent order because the Town owns the properties that comprise the Superfund Site.

22

153.    On May 20, 2020, the Town executed the consent order.    On June 23, 2020, NYSDEC executed the consent order and the consent order became effective by its terms on June 30, 2020.  The consent order's formal title is "Order on Consent and Administrative Settlement."

154.    The consent order requires the Town to, *inter alia*: (i) pay New York State's past and future costs associated with NYSDEC's site characterization (SC) and otherwise, (ii) conduct an investigation (Remedial Investigation (RI) and Feasibility Study (FS)) of the contamination at and emanating from the Superfund Site under NYSDEC oversight, and (iii) remediate the contamination at and emanating from the Superfund Site under NYSDEC oversight.

155.    Pursuant to the terms of the Consent Order, on August 11, 2020, the Town paid $327,186.01 to NYSDEC for reimbursement of NYSDEC's costs associated with the Site Characterization.

156.    Pursuant to the terms of the Consent Order, NYSDEC set the Town an invoice dated July 14, 2021 in the amount of $49,070.17 for NYSDEC costs incurred from October 31, 2019 through March 31, 2021 and NYSDOH costs incurred from January 1, 2016 through March 31, 2021.

157.    Pursuant to the terms of the Consent Order, Town remitted payment in the full amount of the invoice ($49,070.17) by check dated October 21, 2021.

## VIII.    Defendant Village Has Stonewalled Town and NYSDEC from Necessary Information

158.    In anticipation of complying with NYSDEC's ultimate demand for the Town to execute the consent order and Town's requirement to submit a remedial investigation workplan soon thereafter, Town, through counsel, sent a letter on March 27, 2020 to Village's counsel requesting "information and documentation setting forth the locations of where EHFD used and

stored AFFF within the boundary at and around the Superfund Site during the period of 1960 through the present."

159.    On April 7, 2020, Village, through counsel, responded to such request by refusing to provide any such information and asserted that Town's "discovery demand is inappropriate".

160.    On April 28, 2020, Town filed a motion for leave with the Court requesting, *inter alia*, an Order directing Village to provide such information.  Village objected to such request and failed to produce any information in its objection.  Plaintiff's Executive Committee also objected to Town's motion stating that "[t]he PEC does not dispute that the Town may need additional information from the EHFD regarding its use and storage of AFFF[], however, as discussed below, the Town's pending motion should not be prioritized over any other similar issues in this MDL as it deserves no prominence over same."

161.    On May 28, 2020, the Court ultimately sided with Plaintiff's Executive Committee and denied Town's motion due to concerns about the floodgates opening for site-specific discovery in this MDL, which contains more than 700 cases.

162.    On June 18, 2020, NYSDEC sent a letter to counsel to Defendant Village stating in pertinent part:

> The Department has determined that your client the Village of East Hampton (the "Village"), as a past or present owner, arranger, generator, transporter, supplier, or operator of the [Superfund] Site, including successors and assigns of these same entities, is a responsible party for the [Superfund] Site's contamination and therefore liable for the reimbursement of funds expended by the State of New York in taking response actions, including oversight, investigative, planning, removal, and remedial work, to address the Site's contamination.  The Town of East Hampton (the "Town"), which the Department has also determined is a responsible party for the Site's contamination, has signed an administrative consent order (a "Consent Order") with the Department under which it agrees to undertake a remedial program in connection with the contamination at or emanating from the Site.

As we discussed on May 26th, it is important that the Village provide the Department with any and all relevant information about the Site, including the Village's operations at the Site, in order to maximize the effectiveness of the investigation and remediation of the Site. The Town is currently developing a work plan to investigate the contamination; therefore, any information the Village has is needed as soon as possible. Please provide a complete records search report to the Department on behalf of the Village (including the East Hampton Fire Department, agents, and consultants) within thirty (30) days of the date of this letter. The records search report must include the following:

. . .

A concise summary of information held by the Village and the Village's attorneys (including the East Hampton Fire Department, agents, and consultants) with respect to:

a. A history and description of the Site, including
    . . .

    ii. locations on or adjacent to the Site where AFFF was used, stored, or released

. . .

b. The types, quantities, physical state, locations, methods, and dates of disposal or release of AFFF or hazardous waste at or from the Site;

. . .

d. The names and addresses of all persons or entities that disposed of hazardous waste or used or otherwise released AFFF, including the dates of such disposal or release and any proof linking each such person or entity with the hazardous waste or AFFF identified.

163.    On July 20, 2020, the Village, through attorneys, responded to the June 18, 2020

NYSDEC letter and failed to provide *any* information responsive to NYSDEC's requests

referenced above.  Specifically, the July 20, 2020 letter failed to identify a single location where

EHFD used or may have used AFFF and stated that Village's investigation was "ongoing" notwithstanding the lengthy time period Village has had to conduct such investigation.

164. By the July 20, 2020 letter, the Village admitted that in or after August 2017 "[t]he EHFD moved the barrels of AFFF that it was storing at the Airport substation" confirming that EHFD stored barrels of AFFF at the EHFD Substation, presumably for decades. The letter further confirmed that EHFD continues to store a large quantity of AFFF in its crash response truck, which is housed at the EHFD Substation.

165. Due to Village's recalcitrance, Town requested an extension from NYSDEC of the Consent Order's remedial investigation workplan submission deadline. NYSDEC ultimately granted that extension through October 30, 2020 but advised that it was not inclined to grant further extensions.

166. On August 25, 2020, Town's consultants conducted a site visit of the EHFD Substation in preparation for the remedial investigation workplan. During that site visit, Chief Gerard Turza of EHFD was present as well as Village's counsel, among other parties. Chief Turza was able to provide detailed information regarding peripheral matters such as gas, telecom, electric and water utility connections at the EHFD Substation, but unsurprisingly lacked knowledge of central facts as he could not identify if or where EHFD stored AFFF at the Property other than within its crash response truck. He also failed to identify a single location where EHFD used AFFF. Further, the Chief admitted during the site visit that members of EHFD who have knowledge of AFFF use and storage locations have been and continue to withhold such information from the Town.

167. In August 2020, the Town discovered the police reports referenced above revealing EHFD's use of foam and responses to plane crashes previously unknown to the Town. Village

never disclosed these events, whether in response to NYSDEC's or Town's requests for information, or otherwise.

168.    On September 1, 2020, Town via email provided the pertinent police reports to Village via email and requested that Village provide information regarding the whereabouts of the foam use locations referenced in the police reports and other source locations.  Town also requested that Village produce photographs maintained by a long-time EHFD firefighter who the Town learned would regularly photograph EHFD's responses to plane crashes and other events. Town requested the information to enable the development of Town's remedial investigation workplan.

169.    On September 11, 2020, Village, through counsel, responded, in pertinent part:

> We were surprised to receive the police records in the Town's custody and control, which should have been produced long ago. Now that you have produced them, we are investigating these matters.  We will keep you apprised of any information related to these events.  With respect to the specific requests in your email, the Village is continuing to gather such information, including identifying former EHFD personnel with knowledge of issues relating to AFFF.  The Village is also searching for photographs of fire response incidents.

## IX.    The Town's Remedial Investigation Under NYSDEC Oversight

170.    Pursuant to the terms of the Consent Order, the Town was required to submit a remedial investigation work plan.  A remedial investigation work plan, *inter alia*, outlines locations where environmental media (*e.g.*, soil and groundwater) that will be sampled to delineate the full nature and extent of contamination at and emanating from the Superfund Site.

171.    After having pre-submission meetings and calls with NYSDEC, Town, through its consultant, FPM Group timely submitted a proposed remedial investigation workplan to NYSDEC.  The final workplan incorporated NYSDEC's comments and was approved by

NYSDEC. The workplan calls for the remedial investigation of contamination at and, if necessary, emanating from the Superfund Site. The remedial investigation will be conducted in phases.

172. After Town submitted the workplan and before NYSDEC approved it, Village, though counsel, submitted an unsworn April 21, 2021 letter to NYSDEC. While most of the letter is self-serving and contradicted by pictures and sampling data, the letter discusses "new evidence" EHFD found after Town provided the police reports to Village's counsel 7 months earlier as referenced *supra*. By the letter, EHFD admits it used AFFF in response to various plane crashes at the airport and at the EHFD Substation. EHFD also admitted that it possesses National Foam Universal Gold AFFF in its crash truck, which it parks at the EHFD Substation.

173. Despite Town's demands, EHFD has never confirmed that it has properly disposed of the AFFF from the EHFD Substation.

174. In September 2021, NYSDEC issued a public fact sheet titled "Investigation to Begin at State Superfund Site." The fact sheet states, in pertinent part:

> The investigation work plan, called a "Remedial Investigation Work Plan (RIWP)," was submitted to NYSDEC under New York's State Superfund Program. The site is listed as a class "2" site in the State Registry of Inactive Hazardous Waste Disposal Sites (list of State Superfund sites). A class 2 site represents a significant threat to public health or the environment; action is required. NYSDEC and the New York State Department of Health (NYSDOH) will oversee the investigation. The first phase of field work is scheduled to commence in September and take approximately one month to complete. The second and third follow up phases are scheduled to be completed in spring 2022 . . . Fire-fighting foam containing per- and polyfluoroalkyl substances (PFAS) was used and stored on the East Hampton Airport for crash response and training. PFAS, including perfluorooctanesulfonic acid (PFOS) and perfluorooctanoic acid (PFOA), have been detected in on-site soil and groundwater and off-site groundwater and private drinking water wells. The concentrations of PFOS and PFOA exceed the New York State maximum contaminant limit (MCL) of 10 parts per trillion for each contaminant in drinking water wells. Mitigative

measures, including supplying bottled water, the installation of in-home activated carbon treatment systems and the extension of water main have been taken to reduce human exposures to PFOS/PFOA in the private water supplies. DEC will keep you informed throughout the investigation and cleanup of the site . . .

175.    To date, Phase I of the remedial investigation has been completed.   Phase I involved on-site soil sampling – primarily at the surface.   Town detected PFOA/PFOS contamination at, *inter alia*, the location of two plane crashes, the EHFD Substation and the Fire Training Facility.  The highest level of soil contamination detected during Phase I of the remedial investigation was at the EHFD Substation at 105 parts per billion of PFOS.

176.    Soil contamination was detected during Phase I of the remedial investigation at the Fire Training Facility at 15.3 ppb of PFOS.

177.    In addition, NYSDEC required Town, through its consultant, to conduct additional PFAS sampling of certain drinking water wells in the residential/commercial area south of the Superfund Site contemporaneously with the Phase I of the remedial investigation.  The sampling resulted in several wells having exceedances of the PFOA/PFOS MCL(s).

178.    Since the commencement of the remedial investigation, NYSDEC has requested that Town pay to hookup several commercial properties with well exceedances of the PFOA/PFOS MCL to the extended water main located along Montauk Highway and south of the Superfund Site.  Town is in the process of complying with NYSDEC's requests and expects the connection costs to range from $9,100 to $42,419.84 per property.

179.    As recent as April 2022, NYSDEC has demanded that the Town supply bottled water to additional properties in Wainscott and connect them to the extended water main.  Town is in the process of doing both.  Town expects NYSDEC to request it hookup other properties as well.

29

180.    PFOA and PFOS do not degrade in the environment meaning contamination will persist without active remediation.

181.    It is expected that NYSDEC will require significant and active remediation at the Superfund Site and contamination emanating therefrom throughout Wainscott (over 1,000 acres) to remedy the contamination that persists in the sole source aquifer.

182.    In October 2020, NYSDEC issued soil cleanup guidelines, the applicable standards (as amended)  for which will be used to investigate and remediate at and around the Superfund site.

183.    NYSDEC is considering adopting its currently proposed soil cleanup objectives for PFOA/PFOS which are more stringent that the soil cleanup guidelines.

184.    As stated above, the MCLs serve as groundwater cleanup standards.

185.    The primary way to abate PFOA/PFOS contamination in soil is by excavation and disposal.

186.    The primary way to abate PFOA/PFOS contamination in groundwater is by pumping the groundwater through granular activated carbon and discharging the cleansed groundwater back into the aquifer.

187.    The Town's cost to investigate and remediate the contamination at and emanating from the Superfund Site will cost tens of millions of dollars.

188.    To address the contamination caused by EHFD, Town has paid millions of dollars and will pay millions more at the direction and oversight of NYSDEC and NYSDOH to protect the health and safety of its residents.  Instead of assisting the Town, Village has stonewalled the Town from obtaining pertinent information, has not cooperated with the Town's efforts, and has refused to contribute any funds to address the contamination.

## X.    **The Village's Insurance Policy**

189.    According to a letter dated September 24, 2019 from Rubin, Fiorella & Friedman LLP as coverage counsel to AAIC, the Village's insurer, sent in connection with a previously commenced litigation by the Town relating to the Village's use of AFFF–

> AAIC issued a series of general liability policies to Inc. Village of East Hampton, which have renewed on August 1 of each year dating from August 1, 1998 to August 1, 2018 (the "AAIC Policies"). The AAIC Policies also provide commercial umbrella coverage. The policy limits for each policy period are set forth in Exhibit A, which is enclosed.
>
> The AAIC Policies' Emergency Service Organization General Liability Coverage Form, which dates back to the policy beginning August 1, 2006[], provides relevant to our analysis as follows:
>
> . . .
>
> This insurance does not apply to:
>
> . . .
>
> (c) Pollution
>
> Any injury, damage, expense, cost, loss, liability or legal obligation arising out of or in any way related to pollution, however caused . . . This exclusion does not apply to:
>
> (1) "Emergency Operation" conducted away from premises owned by or rented to you or any fire department, hazardous materials unit, first aid squad" ambulance squad or rescue squad qualifying as an insured under this part; or
> (2) "Training operations"; or
> (3) Water runoff from the cleaning of equipment used in 'emergency operations'' or
> (4) . . .
> (5) "Bodily injury" or "property damage" caused by heat, smoke or fumes from a "hostile fire":
>       (a) At or from premises you own, rent or occupy; or

(b) At or from any site or "location" in connection with operations described in (1), (2), or (3) above.

190.    The letter goes on to state that EHFD is a "covered emergency service organization" and is a named insured.

191.    The letter goes on to state that the Policy limits for the AAIC policies for the period of 1998 to 2018, inclusive of the excess policy limits range from $6 million per occurrence and $13 million aggregate per year to $11 million per occurrence and $23 million in the aggregate.

192.    According to Second Circuit case law, the migration of contaminants in groundwater constitutes new property damage triggering policies for all years in which contaminants migrate.

193.    As PFOA/PFOS have migrated and continue to migrate in groundwater as a result of EHFD's use of AFFF, storage of AFFF and washing of AFFF equipment, Village has tens of millions, if not over one hundred million dollars of applicable coverage.

194.    Due to the foregoing, the letter does not deny AAIC's obligation to indemnify the Village and merely serves as a reservation of AAIC's rights on very limited grounds.  The letter likewise states that AAIC has a duty to defend Village.

195.    VFIS a division of Glatfelter Insurance Group ("VFIS"), the underwriter for AAIC, touts itself as "America's Leading Insurance Provider for Emergency Organizations" markets the Emergency Service Organization General Liability Coverage Form to provide coverage for "[o]perational pollution liability for incidents arising from training activities, equipment washdowns or off-premises emergency calls."

196.    Both AAIC's and VFIS's names are prominently displayed in large bold letters on the cover pages of the Village's insurance policies.

197.    The VFIS marketing materials provided for these policies provide scenarios for which coverage applies including the following examples:

a.    "A fire department is called to the scene of an overturned tank truck transporting chlorine gas.  While extricating the driver with a jaws of life tool, the fire department punctures the tank holding the chlorine gas.  The people in the area are overcome by the gas fumes and require medical treatment.  The Operational Pollution Liability coverage would provide the department with a defense and pay any judgment up to the limit of the policy."

b.    "A fire department used several types of accelerants to burn down some old sheds on their property. Newer members were trained on how to extinguish each blaze. Traces of these accelerants were found on a neighbor's land and in another neighbor's drinking water. Claims were filed against the fire department for the costs of drilling a new well and removing the contaminated earth. The Operational Pollution Liability endorsement would pay any judgment or settlement that resulted, up to the limit of the fire department's policy."

c.    "A fire department responds to a fire at a local chemical plant. Smoke from the plant settles on the truck, ladders and other equipment. Upon returning to the station, the equipment is hosed down. The runoff water flows down the street into a neighbor's privately owned pond, contaminating the pond and killing fish and exotic plants. The Operational Pollution Liability coverage would protect the fire department against legal action by the neighbor and would pay an award up to the limit of the policy."

198.    The foregoing examples, are substantially and materially similar to Plaintiff's claim against Village here.

### FIRST CAUSE OF ACTION AGAINST DEFENDANT VILLAGE
**Mandatory Injunction Pursuant To 42 U.S.C. § 6972(a)(1)(B) (RCRA)**

199.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

200.    Pursuant to 42 U.S.C. § 6972(a)(1)(B)-

[A]ny person may commence a civil action on his own behalf . . . against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or

33

> operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).

201.     Pursuant to 42 U.S.C. § 6903(15), Plaintiff is a "person" as referenced in 42 U.S.C. § 6972(a)(1)(B).

202.     Pursuant to 42 U.S.C. §§ 6903(15) and 6972(a)(1)(B), Defendant is a "person" as referenced in 42 U.S.C. § 6972(a)(1)(B).

203.     Pursuant to 42 U.S.C. § 6903(5), PFOA and PFOS are solid wastes and/or hazardous wastes.

204.     Defendant has contributed and/or is contributing to the handling, storage, and/or disposal of solid waste and/or hazardous wastes at and emanating from the Superfund Site.

205.     Defendant's handling, storage, and/or disposal of AFFF containing PFOA/PFOS and/or their precursors within the boundaries of the Superfund Site may present an imminent and substantial endangerment to the health of the citizens of the Town and/or the environment.

206.     By reason of the foregoing Plaintiff is entitled to an injunction requiring Defendant to: (i) properly dispose of all AFFF that contains PFOA, PFOS and/or PFOA/PFOS precursors, (ii) immediately disclose by fact discovery document production and testimony all locations where EHFD used AFFF, stored AFFF and washed AFFF equipment at the Airport and/or within the boundaries of the Superfund Site, and (iii) investigate and remediate, or pay for the investigation and remediation of, all PFOA/PFOS contamination at and emanating from the Airport and/or Superfund Site caused, in whole or in part, by EHFD's storage of AFFF, use of AFFF and washing of AFFF equipment.

## SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
### Response Costs Pursuant to 42 U.S.C. § 9607 (CERCLA)

207.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

208.    Each Defendant is a "person," as defined by Section 101(21) of CERCLA, 42 U.S.C. §§ 9601(21), as an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, municipality, commission, political subdivision of a State, or any interstate body.

209.    Each Defendant is a responsible party pursuant to section 107(a) of CERCLA as each Defendant is the current operator of the Superfund Site, was the operator of the Superfund Site at the time of disposal of PFOA/PFOS at those facilities, and/or arranged for disposal of PFOA/PFOS at the Superfund Site.

210.    By each Defendant's AFFF use, AFFF storage and washing of AFFF equipment, each Defendant has contributed to the contamination at and emanating from the Superfund Site.

211.    The Superfund Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

212.    Disposal of hazardous substances at the Superfund Site resulted in the release of hazardous substances to the environment (as the term "release" is defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22)).

213.    Each Defendant is liable under Section 107(a) of CERCLA, 42 U.S.C. § 6907(a).

214.    Consistent with the National Contingency Plan, Plaintiff has incurred, is incurring, and will continue to incur necessary response costs to address the release or threatened release of hazardous substances at and emanating from the Superfund Site, as required under CERCLA, 42

U.S.C. § 9607(a), and as set forth in the rules promulgated by the EPA, 40 CFR Sections 300 et seq.

215.    By reason of the foregoing, Plaintiff is entitled to judgment for all response costs and damages incurred to the date of judgment.

**THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**Response Costs Pursuant to 42 U.S.C. § 9613(f)(1) (CERCLA)**

216.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

217.    Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f), provides in pertinent part that:

> any person may seek contribution from any other person who is liable or potentially liable under § 9607(a) of this title, during or following any civil action under § 9606 of this title or under § 9607(a) of this title.

218.    Each Defendant is a potentially responsible party pursuant to section 107(a) of CERCLA.

219.    The Superfund Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

220.    Disposal of hazardous substances at the Superfund Site resulted in the release of hazardous substances to the environment (as the term "release" is defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22)).

221.    Each Defendant is liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

222.    The Consent Order constitutes a civil action under 42 U.S.C. § 9607.

223.    By reason of the foregoing, Plaintiff is entitled to judgment for all (or alternatively each Defendant's equitable portion) of response costs and damages incurred to the date of judgment.

### FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**Response Costs Pursuant to 42 U.S.C. § 9613(f)(3)(B) (CERCLA)**

224.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

225.    By the Consent Order, Town has resolved its liability to New York State (NYSDEC) by an administrative settlement with respect to the response actions and costs that have been and will be incurred with respect to contamination at and emanating from the Superfund Site.

226.    Pursuant to 42 U.S.C. § 9613(f)(2), Town is afforded contribution protection for all response actions taken under the consent order, including actions to investigate and remediate contamination at and emanating from the Superfund Site.

227.    Each Defendant is a responsible party pursuant to 42 U.S.C. § 9607.

228.    Each Defendant is not a party to the Consent Order.

229.    Pursuant to 42 U.S.C. § 9613(f)(3)(B), Town may seek contribution from each Defendant for all costs expended and to be expended by the Town.

230.    By reason of the foregoing, Plaintiff is entitled to judgment for all (or alternatively each Defendant's equitable portion) of response costs and damages incurred to the date of judgment.

### FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**Declaratory Judgment Pursuant To 42 U.S.C. § 9613(g)(2)  (CERCLA)**

231.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

232.    By reason of the foregoing, an actual, substantial and legal controversy now exists between Plaintiff and each Defendant regarding each Defendant's obligation to fund all future costs associated with addressing the contamination at and emanating from the Superfund Site as referenced herein (including, but not limited to, costs of compliance with NYSDEC, all subsequent remediation, and all applicable laws).

233.    A declaratory judgment will prevent the need for multiple lawsuits as Plaintiff continues to incur costs of response in connection with the Superfund Site for which each Defendant should be liable, and will provide a final resolution of the issue between the parties regarding liability for such costs.

234.    A declaratory judgment will insure that each Defendant pays its fair share of costs in connection with addressing the contamination at and emanating from the Superfund Site, insuring a proper response to the problem.

235.    A declaratory judgment will insure that Plaintiff's and each Defendant's allocation of cost associated with addressing the contamination at and emanating from the Superfund Site is established, insuring a proper response to the problem.

236.    Public interest will be served in that a declaratory judgment will insure an environmentally proper response to the contamination existing at the Superfund Site.

237.    Plaintiff is entitled to a declaratory judgment under 42 U.S.C. §9613(g)(2).

238.    Plaintiff is thus entitled to a declaratory judgment that each Defendant is legally responsible for the future response costs, and any other future costs incurred by Plaintiff in connection with the Superfund Site.

**WHEREFORE,** Plaintiff Town of East Hampton requests judgment in its favor and against each Defendant as follows:

i.      An injunction requiring Village to: (i) immediately disclose by fact discovery document production and testimony all locations where EHFD used AFFF, stored AFFF and washed AFFF equipment within the Town, including but not limited to, the Superfund Site at the Airport and/or within the boundaries of the Superfund Site, as well as the contact information for all individuals with knowledge of such information, and (ii) investigate and remediate under NYSDEC oversight with participation of the Town, or pay for the investigation and remediation of, all PFOA/PFOS contamination at and emanating from the Superfund Site caused, in whole or in part, by EHFD's storage of AFFF, use of AFFF and washing of AFFF equipment;

ii.      A money judgment in an amount to be determined at trial against all Defendants for all past and future costs incurred or to be incurred by Plaintiff responding to the PFOA/PFOS contamination at and emanating from the Superfund Site, including, but not limited to, (i) costs to supply bottled water to the Town's residents who have detected PFOA/PFOS compounds in their drinking water wells, (ii) costs to extend the public drinking water supply line and connecting the homes of Wainscott residents thereto to enable the supply of clean and safe drinking water, (iii) costs to investigate, treat and remediate contamination at and emanating from the Superfund Site, (iv) costs incurred by the Town to connect properties to the water main or provide an alternative water source, and (v) costs to protect the public health, safety, welfare, and the environment;

iii.      A declaratory judgment declaring each Defendant's allocation of costs and liability associated investigating and remediating the Superfund Site and NYSDEC compliance;

iv.      All other appropriate injunctive relief;

v.      All other appropriate declaratory relief;

vi.      Awarding punitive damages in a sum to be determined at trial;

vii.      Awarding pre- and post-judgment interest, with costs and disbursements

viii.     Awarding Plaintiff the costs of litigation, including legal fees, expert witness fees and associated litigation costs, in an amount to be determined at trial, pursuant to and/or 42 U.S.C. § 6972(e); and

ix.     Awarding such other, further and different relief as the Court deems just and proper.

Dated:  May 23, 2022
       Melville, New York

                        Respectfully submitted,

                        **RIGANO LLC**
                        *Attorneys for Town of East Hampton*

                        By: */s/ Nicholas C. Rigano*
                              James P. Rigano, Esq.
                              Nicholas C. Rigano, Esq.
                              538 Broad Hollow Road, Suite 301
                              Melville, New York 11747
                              (631) 756-5900